20-1713. Attorney Feigenbaum, please introduce yourself for the record and proceed with your argument. May it please the Court, my name is Jonathan Feigenbaum. I represent Karen Jette. Before I proceed, may I reserve two minutes for rebuttal? Yes. Thank you, Your Honor. In my allotted time, I plan to focus on two topics. The first is, since 2002, under the Secretary of Labor ERISA Claims Regulations, the fiduciary violates Section 503 of the ERISA statute. If the fiduciary generates new evidence during the pre-suit appeal, the participant asks the fiduciary to share it and to respond to the new evidence, and the fiduciary refuses. The second topic I want to address is why the outcome for Ms. Jette likely would have been in her favor if Dr. Thompson's report had been divulged before United closed the record. We know in hindsight Dr. Thompson's report was important because the district court relied on it heavily. Without Dr. Thompson's report, United's evidence supporting its benefit decision was meager when weighed against her medical history and corroborating evidence, including a prior independent medical exam conducted by United. Had Ms. Jette seen Dr. Thompson's report before United closed the record, Ms. Jette would have rebutted it with contrary evidence, such as a functional capacity evaluation, neuropsych testing, and her own independent medical exam. So, back to the first topic. When Ms. Jette appealed United's professionals that United might generate during the appeal and give her a chance to respond. Within days of Ms. Jette's written request, United wrote back and said in substance, no way. United said, in essence, we can withhold evidence to stack the claim review to our advantage, even though we're a fiduciary imposed by statutory law. That attitude and practice violated the secretary's claim regulations. It's just not that hard to be fair. Section 503 of the ERISA statute says a plan must afford full and fair review, but it doesn't provide any more detail. Those details have been left with the secretary to develop, and over time the secretary has. The pertinent regulations provide three intertwined rights to protect the plan participant and to assure that the review process is fair. The three core rights are, one, to receive copies of all documents generated during the course of a benefit determination. The regulation actually does use the word generated. It's in the definitions under M8 in defining documents. Two, the right to comment on the records considered in the claim review process. Three, during the appeal, the fiduciary must respond to the evidence submitted by the participant. So the rationale behind these three core rights, it's essentially to prevent sandbagging participants, a term that this court has used in Bard v. Boston Shipping, with new supporting rationales for justifying an adverse benefit determination and not allowing the participant to offer counter to evidence. In the ERISA regulatory structure, clear notice by the fiduciary to the participant is the hallmark of the regulatory scheme. And again, this is to fulfill the statutory goal of full and fair review. So when a fiduciary withholds a key medical report and does not let the participant to respond, the participant is never afforded full and fair review. So that's what happened here. United withheld Dr. Thompson's real-world difference. We start out with the primary goal of ERISA in theory when Congress passed it, was to resolve disputes over benefits inexpensively and expeditiously. But in practice, this hasn't borne out. In this case, for example, United terminated benefits on the weakest of grounds. United's in-house physician, Dr. Hymanen, who I pointed out was by discipline and OBGYN, hadn't practiced medicine for over 20 years, wrote a less than a fair recitation of the facts to Ms. Jetty's treating surgeon, Dr. Buljinsky. And keep in mind that Ms. Jetty had been diagnosed with failed back syndrome. About nine months... Mr. Steinbunk? Yes. Yeah, let me ask you a question about the evidence. Aside from the medical evidence, the insurer relied upon some observations of your client, relied upon the fact that she was able to run a business, her involvement in that Yes, executive director. And I'm just trying to understand how you counter that evidence. I will answer your question, Judge Thompson. It's taken completely out of context. She was, quote, running a pot, a little, she was selling some tchotchkes, I'll call them, online. At one point, she supposedly had some little online retail store. There is nothing in the record that disclosed that she was spending regular work hours doing that, and she just wasn't. And what was really unfair about Dr. Hymanen's recitation of the facts is she implied things such as Ms. Jetty was riding motorcycles. They were all references to social Jetty had the capability to, you know, quote, run a business. Just to pin it down, the motorcycle evidence was pre-back condition? Correct. Absolutely. And she didn't have a brick and mortar store? She may have had, I'm wrong to clear myself, the brick and mortar store may have gone on for a little while post-disability in an attempt to do something. But then it appears that she was selling tchotchkes online for some period of time. But I want to be clear, she was emphatic and filed an affidavit saying she had not ridden a motorcycle since, we'll say, her back surgery. And if you look at the way Dr. Hymanen wrote to Dr. Bolchinsky, Dr. Hymanen writes, social media reports. It was just such an unfair smear, to be frank, of Ms. Jetty in the way she was portrayed to Dr. Bolchinsky. Because there's also in the record, about nine months before Dr. Bolchinsky signed this little checkmark, he filled out a functional capacity evaluation form of including writing. She could only sit for four hours a day and answered all these detailed questions. And I don't know if I've answered you pointedly, Judge Thompson. Yes. So let me say this. If United was interested in the truth of what was going on, Dr. Hymanen would have proposed a straight up question. There's a famous case out of the Ninth Circuit involving ERISA was written by Judge Kaczynski called Booten versus Lockheed. And the famous quote in there is from a movie. What he said, Judge Kaczynski quoted the movie, he said, what we got here is a failure to communicate. And that is what happened when Dr. Hymanen wrote this 101 word run on sentence that's very hard to decipher. And then Dr. Bolchinsky, for whatever reason, checked the yes box. And in terms of what he was agreeing with, that was not sufficient evidence to terminate the claim based on everything else in the record, such as her medical records, the prior IME by Dr. Glick, who United had hired. United found her credible, not a malingerer. She was fully impaired. The Social Security United terminates the claim, holds back, retains Dr. Thompson, who wrote a more detailed report than many of these other IMEs do. But Ms. Jette didn't know what was in the report, so she didn't rebut it. Because to properly rebut it, frankly, probably would have cost her $10,000 between neuropsych testing, a functional capacity exam, an IME from a legitimate doctor. And it's not reasonable for a claimant who has a $996 a month benefit claim. Counsel, on the point of Dr. Thompson's report not being shared, you do argue that the 2018 amendment or regulation is relevant. But I take it that another one of your arguments is you don't need that. That the agency itself had interpreted the existing regulation since at least 2009 in a way that you would like it interpreted, and therefore our deference would apply so long as it's ambiguous, and on that there's a circuit split. I agree with, we'll say, 99% of what you say. I'd say here's my one little slight difference. Yes. Two points. DOL's position is that the 2002 regulation had always required disclosure of reports even during the appeal. It's set forth in the preamble to the, what we'll call the 2018 newer regulations, and there's a specific footnote saying, not only in the preamble, but there's a footnote saying this is to address the problem created in the 8th Circuit by Midget, the 10th Circuit case, I'm drawing a blank Metzger, and the 11th Circuit case, and to be specifically clear that the 2002 regs have always required this. As to the our deference, I'd say after the Supreme Court decided Kisor, if we're one to conclude that there's ambiguity, the court should defer to DOL's interpretation. But reading the only required under the 2002 regs to disclose reports generated on the initial termination and not disclose anything generated on appeal. So that that's my only slight difference with the way you characterized it, Judge Howard. All right. Let me ask the court if there are additional follow-up questions at this point. No. All right. Thank you, Mr. Feigenbaum. You and we will hear from Mr. McGratton. McGratton, I'm sorry. Good morning, Your Honor. Brooks McGratton, representing the appellee, United of Omaha Life Insurance Company. May it please the court. Chief Judge Howard, a moment ago you referred to a circuit split in this question of the interpretation of the Department of Labor regulation in effect between 2002 and 2018. Allow me to address that. There really is no circuit split. Six courts of appeal have examined this Department of Labor regulation. All right. Tell me why the Ninth Circuit in Salama doesn't come out the way that doesn't come out on the other side and why it is consistent or in line with the others. The Ninth Circuit, and we addressed this in our brief, the give me a moment. I refer the court to Montoya, Northern District of California, 2015 decision that's cited on page 31 of our brief, which discusses the fact that district courts within the Ninth Circuit have largely followed the Metzger line of reasoning. So as the state of the law stands today, we have six circuit courts who agree that this regulation, the 2002 to the 2018 regulation. Is that all you have to say about Salama? It is. And in addition. And that is your argument that there is no circuit split is to not address Salama? Honestly, I think it stands alone against a significant weight of authority by the other circuit courts. Well, is there a split or is there not a split? I'm familiar with the case that you have addressed, and I understand it does interpret the regulation consistently with the way Ms. Jette sees it and proposes today. But we still have the great weight of circuit authority going the other way, addressing this regulation. And there's good reason for that. And I think all of the cases that have addressed this, the Eighth Circuit's Majette decision goes into the greatest analysis and detail about Department of Labor regulation. Part 1H of the regulation, which talks about relevant information, does so in the context of the information used to make the initial claim determination. Part 1H3 which talks about the appeal process, does not call for production of documents created during the appeal process. The preamble, the Department of Labor's preamble to the 2002 version of the regulation, talks about the importance of producing relevant information so that the claimant can make an informed decision whether to pursue an administrative appeal. And the courts uniformly look at that and appreciate that the regulation, in effect at that time, did not require production of an IME generated during the appeal process prior to rendering a final uphold determination. So Ms. Jette contends that the preamble to the 2018 amendments in which the department says we've always interpreted the regulation as requiring disclosure of documents produced during the appeal phase. And she suggests that that position is entitled to our deference. However, two problems. One is the department's statement of its position in that preamble was released two months after United rendered its final determination in this case. So the court... What's unclear about the word always? Always means always. It didn't mean beginning in 2018. It meant always. That's what the department may have said in 2018. However, that's certainly not how the circuit court interpreted it prior to 2018. But it's not totally consistent with a brief that the department filed in 2009 that has been pointed out to us? You are correct. Ms. Jette does cite to an amicus brief. However, that was not widely disseminated, certainly not to the industry. The addressing the question of our deference, I don't think... I'm just trying to what does always mean? You do acknowledge that it goes back at least as far as 2009, that that was the Department of Labor's position. Yes. Referring to the amicus brief. However, we're talking about an amicus brief filed in one case that was not widely disseminated to the industry. But that doesn't make it not their position. Yes. But turning to the issue of our deference, that is whether this court should defer to that position in this case, the Supreme Court has made clear now that our deference applies only when the regulation is genuinely ambiguous. And if you study the opinions we would submit from the various circuit courts of appeal, they are not finding an ambiguity in this regulation. And so we would contend that our has no place in this analysis. The broader question that the plaintiff has... Ms. Jette has raised is whether the district court erred overall in granting summary judgment for United. And United would contend that that decision was properly made. We begin with the understanding that the district court standard of review is deferential by agreement of the parties. The capricious standard applies. And this court has said on many occasions under that standard, it is not the province of the district court to weigh the evidence. The only question before the court is whether substantial evidence exists to support the claim administrator's determination. And here we have the consulting physician, Dr. Hymanen, and IME physician, Dr. Thompson, and Ms. Jette's own treating physician, Dr. Bulsinski, agreed that the medical information in the administrative record did not support functional limitations so great as to prevent her from performing her own regular sedentary occupation. Significantly, a foundation to Dr. Hymanen's opinion was her observation that there was a lack of evidence of medical treatment prior to her report. And her observation is unassailable. Turning to the appellee's brief, pages 17 through 19, we tried to provide the court with a summary of what the medical evidence is for the one year prior to the termination of benefits from Ms. Jette. And if you review that summary, you'll see in that whole year, she saw a physician once for treatment in the entire year. In the months that followed the benefit termination, Ms. Jette saw her physicians, Dr. Younce and Dr. Bulsinski again. Neither one ever said she could not or should not work. In fact, the physicians encouraged her to be more active and to exercise. Dr. Hymanen wrote what she believed to be reasonable restrictions and limitations for Ms. Jette and asked Dr. Bulsinski whether or not he agreed with those restrictions and limitations. He was not confused. He was not misled. And Dr. Bulsinski indicated that he did in fact agree. And the fact that he concurred with Dr. Hymanen's observations is neither surprising nor inconsistent with his own treatment notes. And then during the appeal phase and after conducting the IME, Dr. Thompson also concurred with the restrictions first articulated by Dr. Hymanen and later endorsed by Dr. Bulsinski. In short, Thompson's report mentions that she could drive an automobile and the appellant suggests that there are no facts to support that. In fact, the facts that exist in the record would support the opposite conclusion. And yet she sandbagged as to that because she didn't have the report, didn't have a chance to challenge it. So what do you say to that? Two things to that. Well, let me say this. The issue of whether a claimant can drive a car to work or how they get to work is immaterial to whether or not they can perform their regular occupation. And that is the issue immediately before the court. Can Ms. Jette perform her regular occupation? And whether or not she may have difficulty getting to, I'm sorry. The so-called ability to drive the car was cited in support of her ability to do her job. There is a mention, as I recall, in the administrative record that she should be able to drive at least short distances. Correct. I think overall the IME report is very thorough, it's reasonable, and it cites restrictions and limitations agreed to by Ms. Jette's own treating physician. There is an abundance of substantial evidence in this record to support UNITA's claim determination, and for that reason we suggest summary judgment should be affirmed. Are there any other questions from the panel that I can answer at this time? Thank you, Mr. McGratton. Thank you. Mr. Feigenbaum. Thank you, Your Honor. A couple points I'd like to make. Let me just read from the preamble the DOL rags. It said right in there, right to review and respond to new information. DOL writes, the department continues to believe that full and fair review requires the claimants have a right to review and respond to new evidence or rationales developed by the plan during the pendency of the appeal and have the opportunity to fully and fairly present his or her case at the administrative appeal level as opposed merely to have a right to review such information on request only after the claim has been denied on appeal. So DOL's position there is clear, and then it goes on in the preamble. It was and continues to be the view of the department that claimants are deprived of full and fair review as required by Section 503 of ERISA when they are prevented from responding at the administrative stage level to all evidence and rationales, and that's what happened here. The process wasn't fair. It's just not that hard to be fair. United should have turned over the report, and let me point out a practical problem here if it's not addressed. Someone goes on claim in 2001. The insurer terminates the claim in 2019. Because I'm in the weeds on these cases, I can tell you this goes on. The insurer will say, oh, your claim was from 2001. It's not under the 2018 regulations. We're not going to give you a report. That's the kind of unfairness that still goes on. I'd also like to address what my colleague Mr. McGratton said regarding Dr. Hyman and his here's what she wrote to Dr. Bulginski. Although Ms. Benson's, that's Ms. Jetty's name before she changed it back, complaints are not in dispute. It is my impression that she does not have a physically based medical condition that would preclude her ability to perform full-time, primarily seated work. Ms. Jetty had spinal surgery. Ms. Jetty has what Dr. Bulginski calls failed back syndrome, post-laminectomy syndrome. She had severe and serious medical impairments that prevented her from work. I'm asking the court in substance to decide that withholding the report was unfair, violated all notions of full and fair review. The case should be remanded back to the district court with further instructions to retain jurisdiction and send it back to United for full development of the record. Thank you. Unless there's other questions. Thank you, counsel. That concludes the argument in this case. Attorney Feigenbaum and Attorney McGratton, you should disconnect from the hearing at this time.